# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

CHRISTOPHER HEARN,

Petitioner,

v.

ARTHUR CALDERON,

Respondent.

_______________________________________/

CV F 03-6000 AWI DLB HC

FINDINGS AND RECOMMENDATIONS REGARDING PETITION FOR WRIT OF HABEAS CORPUS

[Doc. 9]

Petitioner is a state prisoner proceeding with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner is represented by Sandra L. Waite, Esq.

BACKGROUND

On December 16, 1999, Petitioner was convicted by jury trial in the Kern County Superior Court of first degree murder while engaged in the commission of a robbery (Cal. Pen. Code[1] § 187(a)), attempted robbery (§§ 664/212.5(c)), and conspiracy to commit robbery (§ 184(A)(1)). (CT 1431.) Petitioner was sentenced to state prison for life without the possibility of parole. (Id.)

Petitioner timely appealed to the California Court of Appeal for the Fifth Appellate District. On February 4, 2002, the Fifth District Court of Appeal affirmed the judgment.[2]

---

[1] All future references are to the California Penal Code unless otherwise indicated.

[2] On February 27, 2002, the Court of Appeal issued a Modification of Opinion on Denial of Rehearing, which had no change or affect on the judgment. (Lodged Doc. No. 3.)

(Lodged Doc. No. 3.)

On March 20, 2002, Petitioner filed a petition for review in the California Supreme Court, which was denied on May 1, 2002. (Lodged Doc. Nos. 4, 5.)

Petitioner did not file any state collateral petitions for writ of habeas corpus.

On July 25, 2003, Petitioner filed the instant federal petition for writ of habeas corpus. On October 3, 2003, Petitioner filed a first amended petition of which this action is proceeding. (Court Doc. 9.)

On April 19, 2004, Respondent filed a motion to dismiss the petition for failure to exhaust, which the undersigned recommended to be granted on June 7, 2004. (Court Doc. 15.) On September 22, 2004, Petitioner filed a motion to stay the proceedings pending exhaustion in the state court of his unexhausted claims. The Court granted Petitioner's request to stay on October 15, 2004. (Court Doc. 23.) On July 22, 2005, Petitioner moved to lift the stay and proceed on his first amended petition, which the Court granted on July 26, 2005. (Court Docs. 35, 36.)

Respondent filed an answer to the first amended petition on August 22, 2005, and Petitioner filed a traverse on November 4, 2005. (Court Docs. 37, 50.)

## STATEMENT OF FACTS

As a preliminary note, there were four individuals involved in the robbery of the Village Liquor Store in Ridgecrest, California on April 9, 1996. Two of the individuals (Annette Rasch and Jannette Serafin) were granted immunity from prosecution in exchange for their testimony in the trial of the other two individuals. At trial, several of the witnesses gave inconsistent statements and denied many of the prior statements given to police during the investigation of the case.

On April 9, 1996, at approximately nine o'clock in the evening, off-duty Deputy Sheriff Thomas Cortese entered the Village Liquor Store in Ridgecrest. (RT 60-62.) He observed the store clerk lying on the floor behind the register counter in a pool of blood. (RT 62.) He immediately went outside the store and called 9-1-1 for assistance. (Id.)

Store clerk, Issa Tohmah, sustained three gunshot wounds, two to the head and one

through his left arm. No powder burns were observed, and the shots were fired from a large caliber gun, such as a .40 caliber. Five expended .40 caliber casings were found in the store and an additional casing was found on the victim's gurney. (RT 130-131.) A glass pipe, lighter, and colored ski mask were also discovered near some dumpsters behind the store. (RT 102.) Nothing appeared to have been taken during the robbery. (RT 131.)

Prosecution Evidence

Brian Holm testified that on April 9, 1996, between the hours of 8:30 p.m. and 8:50 p.m. he was driving past the Village Liquor store when he observed three individuals run out in front of his moving car. (RT 284-288.) They were wearing dark clothing and their faces were covered. Mr. Holm believed that two of the individuals were male and estimated them to be between five feet, ten inches and six feet, two inches, and the other was a female, much shorter, with a ponytail. (RT 290-294.) He believed the female was carrying a backpack. (RT 290-291,

On December 5, 1997, Barstow Police Detective Frank Espinoza interviewed Annette R. by telephone regarding the robbery and murder. (RT 572-574.) He was familiar with Annette as she had previously lived in Barstow. (RT 571-572.) Detective Espinoza attempted to tape record the conversation, however, only a portion of the interview was successfully recorded. (RT 574-575.) Annette stated that she, Barbara Chavez, Jannette Serafin, and Petitioner drove to Ridgecrest to do a robbery. (RT 577-578.) Serafin stayed in the car while she, Chavez, and Petitioner got out. (RT 578.) Petitioner went into the liquor store alone and gunshots were heard. (Id.) Petitioner had shot the store clerk in the head with a .38 or .357 caliber gun. (Id.) Annette R. told Barstow Detective Frank Espinoza that she had better not be arrested or she would change her story and reveal nothing. (RT 599.)

Later that same day, Detective Espinoza taped another telephone conversation with Annette R., in which she stated that while she waited outside the liquor store she first heard gun shots, and then ran into the store and did not see the victim but thought that he was shot in the head. (RT 594; Supp. CT 57-59, People's Exhibit 9-A.)

A few days later, on December 10, 1997, Annette R. was interviewed by Ridgecrest Detective John Ortiz. (RT 172; CT 998.) Annette told Detective Ortiz that she heard two

different guns, and that the clerk shot first and then Petitioner shot. (RT 204-206.) She believed the victim was shot in the head, but was not for sure as everything was a blur. (Id.; CT 1013, 1025.) She stated that Petitioner shot because the clerk shot at him first. She acknowledged that she later heard rumors that Petitioner said she was the shooter. (CT 1025.)

At trial, Annette R. testified she lived with Barbara Chavez, who came home on April 9, 1996, and told Annette they were going to "do a liq." (RT 134-137.) Annette, Barbara, and Jannette drove to Regina Eason's house, also known as "Gina Dean." (RT 138.) She testified that Regina Eason gave one gun to Chris and the other to Barbara. (RT 142.) In exchange for the guns, Eason was to get some money from the deal. (RT 144.) She, Barbara Chavez, Jannette Serafin, and Petitioner had all agreed to go to Ridgecrest to do a robbery. (RT 134-142.) The four of them drove from Barstow to Ridgecrest to do the robbery. During the drive they were drinking beer and smoking weed. (RT 146-147.) When they got to Ridgecrest, they stopped at Dolores Chavez's, also known as Nene, Barbara's sister's house. (RT 147.) From there they went to an unidentified man's house, who suggested the Village Liquor Store as a robbery target. (RT 148-150.) The four of them then drove by the liquor store. (RT 150.) They then went back to Dolores Chavez's house and then to the unidentified man's house. (RT 154-155.) There the four planned the robbery. It was decided that Jannette would stay in the car, Petitioner would enter the store, and Annette and Barbara would count to three and then go in. (RT 156.) Chris entered the store armed with a gun and before they could count to three gunshots were heard. (RT 160-161.) Barbara wanted to leave Petitioner, but Annette went into the store. (RT 162.) She saw Petitioner shooting the store clerk at least two times, maybe three. (RT 163.) After the shots were fired, Chris ran out of the store to Jannette's car. (RT 166.) The four drove back to Dolores's house, Chris was crying and said he did not mean to do it. (RT 167-168.) From Dolores's house, they went back to Eason's house where Chris was lying on the bed crying. (RT 169-170.) Annette acknowledged that she was testifying under a grant of immunity and she had been labeled as a snitch in Barstow. (RT 172, 175.)

Regina Eason is Petitioner's sister. At trial, Eason acknowledged that Barbara Chavez came to her home on April 6, 1996, but denied that Petitioner was ever at her house on that day.

(RT 341-342.) However, she acknowledged that she told Detectives Ortiz and Wieghorst in the initial interview that Petitioner walked up to her house. (RT 343.) Although Eason acknowledged that Barbara Chavez asked her for a gun, she denied giving a gun to Chavez. (RT 345.) She acknowledged however that she told Detectives that she gave Chavez a gun, but stated that Chavez looked at it then gave it back because it was not functional. (Id.) On the evening of April 9, 1996, she saw Petitioner at her home and he was drunk and crying. (RT 346, 353.) When Chavez arrived at her home after Petitioner, Chavez told her that Petitioner had to shoot in an attempt to protect the girls. (RT 361.)

Jannette Serafin testified at trial under a grant of immunity. Serafin acknowledged that on April 9, 1996, Chavez asked her for a ride to Ridgecrest. Annette R. went with Barbara, along with a small Black man she had never seen before and could not identify, called "Tim." (RT 470-472.) She first drove them to Barbara's cousin, Dolores Chavez's house. (RT 476.) She then took them to one of Barbara's friends house. (RT 477-478.) She then went to Burger King, after dropping Petitioner, Chavez, and Annette off in front of the liquor store. (RT 478.) The three of them returned a short time later. (RT 500.)

Serafin was interviewed by Detective Ortiz on December 5, 1997, which was tape-recorded and played for the jury. (RT 469, 479, 584-585; CT 1091, Peoples Exhibit 5-A.) Serafin told Ortiz that Annette R. and Chavez called the man with them "Tim." (CT 1103, 1108.) She dropped Annette R, Chavez, and Petitioner off in the front of the liquor store and then heard shots. (RT 478; CT 1108-1109.) Chavez ran to Serafin's car and told her to start it. (CT 1109.) Although she did not see any guns, she heard the three of them asking who shot first. (CT 1109.) "Tim" was described as about the same height as Chavez and very thin. (CT 1121.)

On October 20, 1998, Serafin was interviewed a second time, which was also taped and played for the jury. (RT 479-480.) During this interview, she stated that Chavez wanted to borrow some money from an individual in Ridgecrest named Chris or Jay. (Supp. CT 9; People's Exhibit 6-A.) Annette R. and an unidentified Black male rode with them. (CT 9-10.) She dropped the three of them off on the corner to go to the individual's house to borrow some

money. (CT 13-14.) They instructed Serafin to wait for them at the Burger King, so they could get something to eat on their way out of town. (CT 15-16.) After waiting approximately 15 to 20 minutes, she heard three gunshots. (Id.) Chavez ran to Serafin's car and seemed hysterical, both Chavez and the male told her to drive. (CT 16-17.)

Dolores Chavez, also known as Nene, Barbara's sister, testified that she rode with Chavez, Annette R., Serafin, and an unidentified male to Ridgecrest. (RT 766-767.) She could not identify Petitioner as the individual who was in the car. She did state that the male was thin and had long hair. She said the females identified him as "Chris." (RT 767.) The four of them dropped her off at her apartment and returned at approximately 9:00 p.m., two hours later then they said they would return. (RT 768-770.) They seemed to be in a rush. (RT 770.)

In an interview with detectives, she stated that Chavez told her that "Chris" and Annette had done it. She stated that the rumors that "Chris" had not entered the store were not true, and that Chavez had never entered the store. (RT 775, 791.)

Evelyn Roesch, a relative of Barbara and Dolores Chavez, and Jannette Serafin, testified that she had a conversation with Frederick Hearn, Petitioner's brother. (RT 863-872.) Detective Ortiz testified that Roesch stated that Frederick told her that Petitioner told Frederick that he was at the liquor store on the night of the shooting armed with a gun, but ran out of the store when he saw a gun. Roesch denied the statement at trial. (RT 872-873.) Frederick told Detective Ortiz that he received the information that he had given to Roesch from his and Petitioner's father. At trial, both Frederick and Petitioner's father denied any implication of Petitioner in the robbery. (RT 303-305, 420-424.)

Defense Case

Kenneth Hawkins testified that he was friends with Annette R. and prior to going into custody in March of 1996, he asked her to watch over some guns that were located at his father's residence. (RT 675-677.) He believed there was a .45, a .357, a nine millimeter and a .380. (RT 677.) Three of them were automatics and one was a .357 revolver. (RT 678.) He stated the four guns were located inside a green Nike bag along with a blue ski mask. (RT 678-679.) When he was released from prison in July 1996, and asked Annette where the guns were, she said they had

been stolen. (RT 679.) During a conversation between Hawkins and Annette regarding a robbery, Annette was drunk and stated that she did not mean to do it, it was an accident, and she did not "mean to shoot the ol' boy." (RT 680-681.)

It was established that Yolanda Jackson, an acquaintance of Annette R., had testified at Regina Eason's trial that Annette R. bragged about being the shooter in an attempted robbery at a liquor store. (RT 694-697.)

April Hearn, Petitioner's wife, testified that during April 1996, she lived with Petitioner. (RT 703.) She testified that she delivered Petitioner's baby on April 13, 1996, and Petitioner was always around during the week before her delivery. (RT 703-705.) She stated he was never gone for a period of four or five hours and he never came home crying the week before the baby was born. (RT 705-706.)

Irene Behn, Petitioner's mother, testified that during April 1996, Petitioner and his wife April resided with her in Barstow, California. (RT 709.) She stated that Petitioner was very excited about his baby being born and he stayed close to home in case they needed to go to the hospital. (RT 709.) He never left for more than an hour and a half. (RT 710.)

Pamela Moore, a friend of Annette R.'s, testified that she told her about a robbery that occurred in Ridgecrest, and that she and her "homey" entered the store, she grabbed a "40 ounce" then went up to the cash register and started firing shots, just like the movie "Menace to Society." (RT 848-849.) She was essentially bragging about what she had done. (RT 850.)

Dwight Van Horn, an independent firearms examiner, testified that it was his expert opinion, after reviewing several pieces of evidence in the case, that a .40-caliber semiautomatic pistol was used during the robbery. (RT 836.) It was also Mr. Van Horn's opinion that there was no evidence that the shots were fired from across the counter. (RT 841.)

The analyses of the head hairs removed from the ski cap found just outside the liquor store ruled out Petitioner as the source. (RT 102-105, 803-803, 1025-1026.)

## DISCUSSION

### A. Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody

pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375, 120 S.Ct. 1495, 1504, n.7 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution. The challenged conviction arises out of the Kern County Superior Court, which is located within the jurisdiction of this Court. 28 U.S.C. § 2254(a); 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059, 2063 (1997; Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), *cert. denied,* 522 U.S. 1008, 118 S.Ct. 586 (1997) (quoting Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), *cert. denied,* 520 U.S. 1107, 117 S.Ct. 1114 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059 (1997) (holding AEDPA only applicable to cases filed after statute's enactment). The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

B. Standard of Review

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

The AEDPA altered the standard of review that a federal habeas court must apply with respect to a state prisoner's claim that was adjudicated on the merits in state court. Williams v. Taylor, 120 S.Ct. 1495, 1518-23 (2000). Under the AEDPA, an application for habeas corpus will not be granted unless the adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d); Lockyer v. Andrade,123 S.Ct.1166 (2003) (disapproving of the Ninth Circuit's approach in Van Tran v. Lindsey, 212 F.3d 1143 (9th Cir. 2000)); Williams v. Taylor, 120 S.Ct. 1495, 1523 (2000). "A federal habeas court may not issue the writ simply

because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Lockyer, at 1175 (citations omitted). "Rather, that application must be objectively unreasonable." Id. (citations omitted).

While habeas corpus relief is an important instrument to assure that individuals are constitutionally protected, Barefoot v. Estelle, 463 U.S. 880, 887, 103 S.Ct. 3383, 3391-3392 (1983); Harris v. Nelson, 394 U.S. 286, 290, 89 S.Ct. 1082, 1086 (1969), direct review of a criminal conviction is the primary method for a petitioner to challenge that conviction. Brecht v. Abrahamson, 507 U.S. 619, 633, 113 S.Ct. 1710, 1719 (1993). In addition, the state court's factual determinations must be presumed correct, and the federal court must accept all factual findings made by the state court unless the petitioner can rebut "the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); Purkett v. Elem, 514 U.S. 765, 115 S.Ct. 1769 (1995); Thompson v. Keohane, 516 U.S. 99, 116 S.Ct. 457 (1995); Langford v. Day, 110 F.3d 1380, 1388 (9th Cir. 1997).

C. Insufficient Evidence to Support Jury's Finding That Petitioner Was a Major Participant in Robbery For Felony-Murder Special Circumstance

Petitioner contends that there was insufficient evidence to support the jury's finding that he was a "major participant" in the robbery for California's felony-murder special circumstances. (First Amd. Pet. at 4-10.) This claim was presented to the California Supreme Court in a petition for review, which was summarily denied.[3] (Lodged Docs. Nos. 4 , 5.)

The law on insufficiency of the evidence claim is clearly established. The United States Supreme Court has held that when reviewing an insufficiency of the evidence claim on habeas, a federal court must determine whether, viewing the evidence and the inferences to be drawn from it in the light most favorable to the prosecution, any rational trier of fact could find the essential

[3] Because the California Supreme Court's opinion is summary in nature, however, this Court "looks through" that decision and presumes it adopted the reasoning of the California Court of Appeal, the last state court to have issued a reasoned opinion. See Ylst v. Nunnemaker, 501 U.S. 797, 804-05 & n. 3, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991) (establishing, on habeas review, "look through" presumption that higher court agrees with lower court's reasoning where former affirms latter without discussion); see also LaJoie v. Thompson, 217 F.3d 663, 669 n. 7 (9th Cir. 2000) (holding federal courts look to last reasoned state court opinion in determining whether state court's rejection of petitioner's claims was contrary to or an unreasonable application of federal law under § 2254(d)(1)).

elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979). Sufficiency claims are judged by the elements defined by state law. Id. at 324, n.16.

On collateral review of a state court conviction, a federal habeas court does not determine whether it is satisfied that the evidence established guilt beyond a reasonable doubt. Payne v. Borg, 982 F.2d 335, 338 (9th Cir. 1992), cert. denied, 410 U.S. 843 (1993). In cases where the evidence is unclear, or would support conflicting inferences,

> the federal court "must presume - even if it does not affirmatively appear in the record - that the trier of fact resolved any such conflict in favor of the prosecution, and must defer to that resolution."

Payne, 982 F.2d at 338.

The prosecutor argued that Petitioner could be liable either as the individual who was the shooter during the attempted robbery or as an aider and abetter. (RT 981.) As stated by the Court of Appeal, the jury returned not true findings on the gun use allegation and the alleged overt acts that Petitioner obtained a gun from Regina Eason to use in the robbery and that Petitioner had entered the Village Liquor store. (Lodged Doc. 3, Opinion, at 3.) Because of these findings, the jury clearly rejected the theory that Petitioner was the actual shooter during the robbery. Therefore, in order for Petitioner to be found guilty under the felony-murder special circumstance, the jury had to determine whether Petitioner was a major participant in the robbery and if he acted with reckless indifference to human life. (§ 190.2, subds. (c)[4]; see Tison v. Arizona, 481 U.S. 137, 152, 158 (1987) ("major participation in the felony committed, combined with reckless indifference to human life," is sufficient to satisfy constitutional requirements for imposition of a capital sentence.].) Under California law, there is no set amount of evidence that is required to deem a person a major participant. See e.g. People v. Proby, 60 Cal.App.4th 922, 933 (1998) ("major participant" has no peculiar meaning in the law and is thus within the common understanding of reasonable people.) Rather, the determination is dependent on the

---

[4] Section 190.2 provides in part: "(c) Every person, not the actual killer, who, with the intent to kill, aids, abets, counsels, commands, induces, solicits, requests, or assists any actor in the commission of murder in the first degree shall be punished by death or imprisonment in the state prison for life without the possibility of parole if one or more of the special circumstances enumerated in subdivision (a) [e.g., murder during commission of robbery] has been found to be true under Section 190.4"

factual circumstances of the case.

The Court of Appeal found that sufficient evidence supported the jury's finding that Petitioner was a major participant in the robbery and acted with reckless indifference to human life. Petitioner "agreed to actively participate in an armed robbery, he drove with his accomplices to the store to 'scope it out' for a possible robbery, he was involved in planning the details of the robbery, he approached the liquor store with his accomplices and came running back to the vehicle with them after the shooting." (Lodged Doc. 3, Opinion, at 20.) The Court of Appeal's conclusion is not unreasonable.

Petitioner relies on the Supreme Court's opinions in Edmund v. Florida, 458 U.S. 782 (1982) and Tison v. Arizona, 481 U.S. 137, and argues that these cases read together require more than mere presence at the scene of the crime. In Edmund, the petitioner was the driver of the "getaway" car in an armed robbery of a dwelling occupied by an elderly couple. Edmund did not personally participate in the robbery and did not intend to kill or attempt to kill the victims. The elderly couple resisted the robbery attempts and were killed by Edmund's accomplices. Edmund and one of his accomplices were sentenced to death. There, the Supreme Court held Edmund's degree of participation in the murders was so tangential that it did not support a sentence of death. The Court acknowledged that "[i]t would be very different if the likelihood of a killing in the course of a robbery were so substantial that one should share the blame for the killing if he somehow participated in the felony." Edmund, at 799. Edmund defined two categories in which the defendant could be sentenced to death. The first is where the defendant intended to kill and the second is where the defendant's participation is major and he had a culpable state of mind.[5]

In Tison, two brothers were sentenced to death for their involvement in a roadside kidnaping, robbery, and murder of a family of four. The defendants, along with others, planned the prison escape of their father and his cellmate. The two brothers armed themselves with guns and entered the prison facility and facilitated the escape of their father and his cellmate. During

---

[5] To the contrary, if the defendant's participation is minor and no culpable state of mind can be shown, then the death penalty is not proportionate.

the escape, a tire on the getaway car went flat on the highway, so one of the defendants flagged down a passing motorist for help. Both defendants participated in the kidnaping and robbery of the occupants of the vehicle and were nearby when their father and his cellmate shot and killed the four victims. Tison, 481 U.S. at 139-141. Citing the Enmund decision, the defendants argued that because they did not intend to kill the victims, their death sentences were disproportionate to their culpability and in violation of the Eighth Amendment. The Supreme Court rejected this argument stating:

> some nonintentional murderers may be among the most dangerous and inhumane of all - the person who tortures another not caring whether the victim lives or dies, or the robber who shoots someone int eh course of the robbery, utterly indifferent to the fact that the desire to rob may have the unintended consequence of killing the victim as well as taking the victim's property. This reckless indifference to the value of human life may be every bit as shocking to the moral sense as an "intent to kill."

Id. at 157.

Petitioner argues that the evidence in this case is far from that in Tison and is materially indistinguishable from the facts presented in Edmund. However, in the instant case, far from merely being the look-out in the "getaway" car as in Edmund, as found by the Court of Appeal, the jury's finding that Petitioner was a "major participant" in the robbery is supported by ample evidence. Petitioner was an active participant in the planning of the robbery, and although he may not have physically entered the liquor store, he was nonetheless present during the robbery and events leading up to it, and fled with the others after the victim was shot and left to die. (RT 134-166, 478-479, 500.) As Respondent argues, the girls wanted an adult male to assist in effectuating the robbery, to which Petitioner agreed, and the jury reasonably inferred that Petitioner provided the necessary confidence to carry out the robbery from start to end. (RT 142-166.) This evidence amply supports the jury's finding that Petitioner was a "major" participant in the robbery.

Further, sufficient evidence supports the jury's finding that Petitioner acted with a culpable state of mind, i.e. reckless indifference to human life. Under California law, the "culpable mental state of 'reckless indifference to life' is one in which the defendant 'knowingly

engag[es] in criminal activities known to carry a grave risk of death'." People v. Estrada, 11 Cal.4th 568, 577 (1995) (quoting Tison v. Arizona, 481 U.S. 137, 157 (1987)). There was ample evidence that Petitioner was aware that his co-conspirator, Barbara Chavez, was handed a gun and carried a gun during the robbery. (RT 142-144, 158-159.) He accompanied the other individuals to the liquor store, and the jury likely concluded that he waited outside the store to do his part in carrying out the plan only to be thwarted by the clerk being shot, and then ultimately fled the scene, after the shooting, leaving the victim to die. These facts amply demonstrate and support the jury's finding that Petitioner acted with reckless disregard to human life.[6]

Based on the foregoing, the state courts' determination of this issue was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent.

To the extent Petitioner is attempting to raise and argue a separate Eighth Amendment claim under Tison and Edmund, it is not cognizable. (See First Amd. Pet. at 10.) As previously noted, in Edmund, the Supreme Court held that the Eighth Amendment does not permit the imposition of the death penalty on a defendant who merely aids and abets a felony murder. Edmund, 458 U.S. at 797. Here, Petitioner was not sentenced to death, but rather received a life sentence without the possibility of parole. As Respondent submits, Petitioner has provided no reason why this principle should be extended beyond the capital context.[7] Accordingly, Petitioner's claim is not cognizable, and such an Eighth Amendment claim was not clearly established Supreme Court precedent at the time the state court conviction became final.

D. The Term "Major Participant" is Unconstitutionally Vague

Petitioner contends that the term "major participant" is unconstitutionally vague as

---

[6] Evidence proving the major participant requirement is often relevant in demonstrating the reckless indifference requirement. See Tison v. Arizona, 481 U.S. at 158.

[7] As recognized by the Court of Appeal, the prosecution initially sought the death penalty against Petitioner, but dropped its request prior to trial. (Lodged Doc. 3, Opinion, at 2.) As Respondent submits, at the time the California state courts issued their decisions here, the legal landscape was clear that Tison and Enmund did not extend the Eighth Amendment principle beyond the capital context. Thus, any "new rule" would not be applied retroactively under Teague v. Lane, 489 U.S. 288, 109 S.Ct. 1060 (1986), where the Supreme Court held that "new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced." Teague, 489 U.S., at 310, 109 S.Ct., at 1075. In any event, as stated above, Petitioner's involvement in the crime was much more than in Enmund. Rather, as in Tison, Petitioner was actively involved in the underlying felony of robbery.

applied in this case.

A statute is only unconstitutionally vague if it "fails to give adequate notice to people of ordinary intelligence" what conduct is prohibited by the statute. Meluguin v. Hames, 38 F.3d 1478 (9th Cir. 1994); see also Coates v. City of Cincinnati, 402 U.S. 611, 614, 91 S.Ct. 1686, 1688 (1971). When determining whether a statue is vague, the Court should look at the common understanding of the statute's terms. Broadrick v. Oklahoma, 413 U.S. 601, 608, 93 S.Ct. 2908, 2913 (1973); United States v. Fitzgerald, 882 F.2d 397, 398 (9th Cir. 1989).

In rejecting Petitioner's claim on direct appeal, the Court of Appeal held:

> The phrase "major participant" derives directly from the United States Supreme Court's reference to "major participation" in *Tison v. Arizona* (1987) 481 U.S. 137, 158. We question how language of this country's highest court - the final arbiter of the United States Constitution - can be unconstitutionally vague.
>
> In any event, the phrase "major participant" has a plainer meaning and is even more commonly understood than "reckless indifference to human life." Our Supreme Court has previously concluded that "reckless indifference to human life" is sufficiently definite to not require additional instruction. (*People v. Estrada* (1995) 11 Cal.4th 568, 581.) "Major" is not used in the statute in a technical sense, nor is it so abstract or obscure a word so as to confuse the average juror. The requirement of *Tison v. Arizona*, *supra*, 481 U.S. 137, and *Enmund v. Florida* (1982) 458 U.S. 782, that the death penalty not be imposed on a non-killer whose participation was only minor, is adequately conveyed by the statute's ordinary and commonly understood terms. "Because the ordinary meaning to the statutory phrase amply communicates the parameters of the [degree of participation] subjecting a defendant to a sentence of death or lifelong incarceration - as articulated in *Tison* - the statute is sufficiently certain. (*People v. Estrada*, *supra*, 11 Cal.4th at p. 581.)
>
> Accordingly, we conclude the average juror is able to ascertain and apply the standard. That different perspectives influence the deliberative process due to the variety in each juror's life experiences, and that the question whether someone was a "major participant" in a particular crime may be a difficult one which must be made on a case-by-case basis, does not mean the phrase is unconstitutionally vague.[8]

(Lodged Doc. 3, at 22-23 (footnote in original and internal citation omitted).)

As Respondent submits, several California courts have found the phrase "major participant" to be commonly understood and one not used in a technical sense peculiar to the law. See e.g. People v. Proby, 60 Cal.App.4th 922, 933-934 (1998); citing People v. Keenan, 46

---

[8] Nor does the fact we must construct a legally "minimum" interpretation of the phrase in order to meaningfully review the record for sufficiency of the evidence imply unconstitutional vagueness. That we (like jurors) must interpret the term, here for the purposes of appellate review, by no means necessitates a conclusion that jurors are unable to do so for themselves.

Cal.3d 478, 504 (1988); see also People v. Estrada, 11 Cal.4th 568, 574 (1995); People v. Green, 227 Cal.App.3d 692, 698-99 (1994); quoted in, People v. Mitchell, 30 Cal.App.4th 783, 799 (1994) ("'The law is replete with instances in which a person must, at his peril, govern his conduct by such nonmathematical standards as 'reasonable,' 'prudent,' 'necessary and proper,' 'substantial,' and the like . . . .'"). Whether a term within a statute needs to be further defined turns on whether it expresses a concept within a jury's ordinary experience. United States v. Moore, 921 F.2d 207, 210 (9th Cir. 1990). Because the phrase "major participant" contains no arcane words, it requires no clarification. Thus, the jury was properly left to use its common sense in deciding whether Petitioner was a major participant in the robbery. As Respondent submits, the point at which Petitioner's participation became "major" was a factual determination properly left to the jury, and does not render the statute unconstitutionally vague as applied in this case. The state courts' determination of this issue was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent. Further, to the extent Petitioner is attempting to raise an Eighth Amendment claim, it fails for the same reasons outlined above in section C.

E. Ineffective Assistance of Counsel

Petitioner contends that trial counsel was ineffective for failing to (1) request a jury instruction defining a "major participant;" (2) object to evidence Petitioner had been in state prison; and (3) request amplification of the California standard jury instruction CALJIC No. 2.20, to account for immunized witnesses. (First Amd. Pet. at 15-18.)

The law governing ineffective assistance of counsel claims is clearly established for the purposes of the AEDPA deference standard set forth in 28 U.S.C. § 2254(d). Canales v. Roe, 151 F.3d 1226, 1229 (9th Cir. 1998.) In a petition for writ of habeas corpus alleging ineffective assistance of counsel, the court must consider two factors. Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064 (1984); Lowry v. Lewis, 21 F.3d 344, 346 (9th Cir. 1994). First, the petitioner must show that counsel's performance was deficient, requiring a showing that counsel made errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment. Strickland, 466 U.S. at 687. The petitioner must show that counsel's

representation fell below an objective standard of reasonableness, and must identify counsel's alleged acts or omissions that were not the result of reasonable professional judgment considering the circumstances. Id. at 688; United States v. Quintero-Barraza, 78 F.3d 1344, 1348 (9th Cir. 1995). Judicial scrutiny of counsel's performance is highly deferential. A court indulges a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. Strickland, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064 (1984); Sanders v. Ratelle, 21 F.3d 1446, 1456 (9th Cir.1994).

Second, the petitioner must show that counsel's errors were so egregious as to deprive defendant of a fair trial, one whose result is reliable. Strickland, 466 U.S. at 688. The court must also evaluate whether the entire trial was fundamentally unfair or unreliable because of counsel's ineffectiveness. Id.; Quintero-Barraza, 78 F.3d at 1345; United States v. Palomba, 31 F.3d 1356, 1461 (9th Cir. 1994). More precisely, petitioner must show that (1) his attorney's performance was unreasonable under prevailing professional norms, and, unless prejudice is presumed, that (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result would have been different.

A court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the petitioner as a result of the alleged deficiencies. Strickland, 466 U.S. 668, 697, 104 S.Ct. 2052, 2074 (1984). Since it is necessary to prove prejudice, any deficiency that does not result in prejudice must necessarily fail.

Ineffective assistance of counsel claims are analyzed under the "unreasonable application" prong of Williams v. Taylor, 529 U.S. 362 (2000). Weighall v. Middle, 215 F.3d 1058, 1062 (2000).

A. Major Participant Instruction

In rejecting Petitioner's claim on direct appeal, the Court of Appeal held:

> Current case law, which was also the law at the time of [Petitioner's] trial, made clear that "major participant" is a commonly understood phrase that does not require further definition. (*Proby*, *supra*, 60 Cal.App.4th at 933-34 [trial court did not err in refusing to instruct on major participant even where such an instruction was requested]; *see also People v. Estrada, supra*, 11 Cal.4th at 574.) [Petitioner] cannot meet the standard for prevailing on a claim of ineffective assistance of counsel where counsel did not request an instruction that prevailing

> professional norms dictated was not required; counsel's decision not to request the instruction may have been a tactical one within the sound discretion of trial counsel. (*People v. Lucas, supra*, 12 Cal.4th [415,] 436,437 [1995].); *see also Strickland, supra*, 466 U.S. at 694.)

(Lodged Doc. 3, Opinion at 23-24.)

As stated by the California courts an appropriate basis for a jury instruction is ordinarily the "language of a statute defining a crime or defense." People v. Estrada, 11 Cal.4th at 574. Further, as previously stated, the term "major participant" is a concept within the jury's ordinary experience and need not be further defined than as defined in CALJIC 8.80.1.[9] Thus, counsel cannot be faulted for failing to request a further jury definition of "major participant" as such request would have been futile. See e.g. Jackson v. Calderon, 211 F.3d at 1148, 1155 (9th Cir. 2000); James v. Borg, 24 F.3d 20, 26 (9th Cir. 1994); Lowry v. Lewis, 21 F.3d 344, 345 (9th Cir. 1994).

---

[9] CALJIC 8.80.1 (1997 Revision) as read to the jury stated:

> If you find [the] defendant in this case guilty of murder of the first degree, you must then determine if [one or more of] the following special circumstance[s]: [are] true or not true: murder in the commission or attempted commission of robbery or burglary.
>
> The People have the burden of proving the truth of a special circumstance. If you have a reasonable doubt as to whether a special circumstance is true, you must find it to be not true.
>
> [If] you are satisfied beyond a reasonable doubt that the defendant actually killed a human being, you need not find that the defendant intended to kill in order to find the special circumstance to be true.]
>
> [If you find that a defendant was not the actual killer of a human being, [or if you were unable to decide whether the defendant was the actual killer or [an aider and abettor] [or] [co-conspirator].] you cannot find the special circumstance to be true unless you are satisfied beyond a reasonable doubt that such defendant with the intent to kill [aided], [abetted,] [counseled,] [or] [assisted] any actor in the commission of the murder in the first degree [,] or with reckless indifference to human life and as a major participant, [aided,] [abetted,] [counseled,] [or] [assisted] in the commission or attempted commission of the crime of robbery or burglary resulted in the death of a human being.
>
> [You must decide separately each special circumstance alleged in this case]. If you cannot agree as to all of the special circumstances, but can agree as to one [or more of them], you must make your finding as to the one [or more] upon which you do agree.]
>
> In order to find a special circumstance alleged in this case to be true or untrue, you must agree unanimously.
>
> You will state your special finding as to whether this special circumstance is or is not true on the form that will be supplied.

(CT 1367-1368.)

B. State Prison Evidence

In rejecting Petitioner's claim on direct appeal, the Court of Appeal held:

> Generally, the failure to make objections is a matter of trial tactics, which the reviewing court will not second-guess. Here, [Petitioner] has provided no declaration from trial counsel from which we can discern counsel's reasoning process in allowing the introduction of evidence showing [Petitioner] was in state prison. We cannot on this record affirmatively conclude it was not a tactical decision, which is within the sound discretion of trial counsel. It is [Petitioner's] burden to establish a record that is adequate to permit meaningful review. What we can discern from the record is that counsel objected at sidebar that evidence one of the witnesses had been threatened was irrelevant and could be prejudicial to [Petitioner] because the jury could infer that [Petitioner] had been involved in the threats. The trial court overruled the objection, and counsel proceeded to allow the testimony that [Petitioner] was in state prison, perhaps to preclude any idea in juror's minds that he had been involved in the threats. While [Petitioner] maintains that "[t]he jury would not infer participation by [Petitioner] in the threats," trial counsel reasonably may have believed the jury could, and we do not second-guess such tactical decision. In any event, we have no way of showing why [Petitioner's] counsel did not object to the admission of such evidence and [Petitioner] has therefore not met his burden.

(Lodged Doc. 3, at 11 (internal citations omitted).)

Petitioner argues that "[i]t is clear that, on the facts of this case, petitioner was prejudiced by this evidence." (First. Amd. Pet. at 16-17.) As Respondent correctly argues, Petitioner has failed to meet his burden. Petitioner did not develop the factual basis of this claim in state court, as he never provided a declaration from trial counsel - either on direct or habeas review - for the state court to discern counsel's reasoning process in allowing the introduction of evidence showing Petitioner was in state prison. In fact, Petitioner never filed a habeas corpus petition in the Kern County Superior Court or the California Supreme Court, before filing the instant federal petition for writ of habeas corpus.

In any event, it appears that counsel had a tactically sound reason not to object because he initially brought up the state prison evidence. On direct appeal, Petitioner conceded, "defense counsel tried to elicit from Detective Espinoza on cross examination that [Petitioner] was in state prison on December 5, 1997, evidently in an effort to show that [Petitioner] did not join in any threats by Chavez's boyfriend House to Serafin." (Lodged Doc. 1, at 22, citing RT 591.)[10] Thus,

[10] During sidebar, defense counsel objected to the evidence regarding threats made against Serafin as irrelevant and prejudicial because it could appear that defendant had been involved in the threats. The trial court found the evidence relevant to the veracity of Serafin's testimony. (RT 587-589.) It was after this ruling that

it was reasonable for counsel not to object to the prosecution's clarification of Petitioner's defense that he was not around for seven months to join in any threats. The state courts' determination of this issue was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent.

C. Request Amplification of CALJIC 2.20 to Account for Immunized Witnesses

Petitioner contends that trial counsel was ineffective for failing to request amplification of CALJIC 2.20 to account for immunized witnesses.

In rejecting Petitioner's claim on direct appeal, the state court found:

> First, CALJIC No. 2.20 includes language covering the matter of immunity even without the addendum. The jury was told that it was the sole judge of believability and that it could consider anything tending to prove or disprove the truthfulness of a witness's testimony. It was also told to consider whether a witness had a bias, interest or other motive to be untruthful. The effect of the grant of immunity upon Annette R.'s credibility was put in issue under these circumstances.
>
> [¶] . . . [¶]
>
> Second, even assuming the pinpoint instruction was critical to [Petitioner's] defense, the jury still knew without the addendum that the grant of immunity was pertinent to the juror's decision about whether Annette R. had a bias or interest which influenced the truthfulness of her testimony. The subject was raised on direct examination, and defense counsel questioned Annette R. about her immunity on cross-examination. Further, defense counsel pointedly argued in closing that all of the prosecutions' witnesses should be disbelieved because of their agreements with the prosecution.
>
> Finally, Annette R.'s credibility was placed under an even higher level of scrutiny by virtue of her status as an accomplice. . . . The law in California recognizes that an accomplice has a strong motive to life [and] [t]his exculpatory motivation requires that the jury consider testimony of an accomplice with caution. The trial court is required to so instruct and did so here. Thus, the jury was specifically instructed that Annette R.'s testimony should be "viewed with distrust." This instruction strongly admonished the jury that Annette R.'s story was inherently suspect, and thus went beyond the passive suggestion [Petitioner] says his trial counsel should have had incorporated into the general credibility instruction.
>
> In sum, we are satisfied that [Petitioner] would not have been acquitted had his trial counsel successfully made a request for a grant of immunity addendum to CALJIC No. 2.20, even if the failure to request it were not a tactical decision.

(Lodged Doc. 3, at 12-14 (internal citations omitted).)

Petitioner claims that "[w]itnesses Serafin and [Annette] Rasch implicated Petitioner in

---

defense counsel tactically asked Detective Espinoza a question designed to show that defendant could not have been involved in the threats against Serafin.

the crime. Rasch, in fact, testified that Petitioner was the shooter. In spite of this, defense counsel failed to request instruction that would aid the jury in determining the credibility of witnesses who had received immunity." (First Amd. Pet. at 17.)

To the contrary, as Respondent argues, the trial court carefully and fully instructed the jury on the subject of immunity, and the fact that Annette Rasch was an accomplice as a matter of law. Specifically, the jury was instructed with the following: CALJIC No. 2.20 (believability of witness); No. 2.21.2 (weighing conflicting testimony); No. 3.10 (accomplice); No. 3.11 (accomplice testimony must be corroborated); 3.12 (sufficient evidence to corroborate accomplice); and No. 3.18 (accomplice testimony to be viewed with distrust). See CT 1288; 1285A, 1310-12, 1315, 1318.

Further, the jury was clearly aware that the witnesses were testifying under a grant of immunity. RT 172-173, 223. Thus, based on the instructions as a whole, the witnesses's admissions that they were granted immunity and the closing arguments, the jury was clearly adequately informed to view the immunized witnesses's testimony with distrust. See RT 1027, 1032-33, 1037, 1039, 1041.

## RECOMMENDATION

Based on the foregoing, it is HEREBY RECOMMENDED that:

1. The petition for writ of habeas corpus be DENIED;
2. The Clerk of Court be directed to enter judgment in favor of Respondent.

This Findings and Recommendations is submitted to the assigned United States District Court Judge, pursuant to the provisions of 28 U.S.C. section 636 (b)(1)(B) and Rule 72-304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within thirty (30) days after being served with a copy, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Replies to the objections shall be served and filed within ten (10) days (plus three days if served by mail) after service of the objections. The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the

right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

**Dated: January 17, 2007** /s/ **Dennis L. Beck**

3b142a UNITED STATES MAGISTRATE JUDGE